**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Edward W. Nottingham**

Civil Action No. 05-cv-01170-EWN-CBS

NCS PEARSON, INC., a Minnesota corporation,

    Plaintiff,

v.

COMPUTER INFORMATION CONCEPTS, INC.,
a Colorado corporation,

    Defendant.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER FOR PRELIMINARY INJUNCTION**

---

Based upon the evidence and arguments of the parties at a hearing conducted on August 2, 2005, pursuant to Plaintiff's Motion for Preliminary Injunction, including the testimony of witnesses Robert Mignanelli and Julie Albanese on behalf of plaintiff NCS Pearson, Inc. ("plaintiff" or "NCS"), and Steven Bohlender and Robert Martin on behalf of defendant Computer Information Concepts, Inc. ("defendant" or "CIC"), and upon the documents and files submitted in this matter, the Court finds the following facts, sets out the following conclusions of law, and issues the following Order for Preliminary Injunction:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. Plaintiff NCS is a Minnesota corporation headquartered in Bloomington, Minnesota.

2. Defendant CIC is a Colorado corporation headquartered in Greeley, Colorado.

3. The rights of the parties arise out of a contract entitled Certified Services and Support Alliance Agreement (the "Agreement").

4. Through the Agreement, the plaintiff licensed numerous software modules to the defendant, using the brand names CIMS and SASI. The SASI products are not at issue in this preliminary injunction proceeding, and the Court therefore considers only the CIMS products.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity jurisdiction) because the Complaint includes federal trademark claims, and the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the defendant resides in this district, because a substantial part of the events giving rise to the claims occurred in this district, and because a substantial part of the property that is the subject of this action is situated in this district.

6. In order to obtain a preliminary injunction, the moving party has the burden of showing (1) that there is a substantial likelihood that it will prevail on the merits; (2) that it will suffer irreparable harm if the preliminary injunction is not granted; (3) that the threatened injury

to the moving party outweighs the damage the proposed injunction may cause to the non-moving party; and (4) that the injunction is consistent with the public interest. In cases where there is a request for mandatory relief or for relief that the plaintiff would obtain at the end of the case, the courts scrutinize the showing of substantial likelihood of success very closely. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 975 (10th Cir. 2004) (*en banc*).

7. Although it asserts other claims in its Complaint, plaintiff makes three claims for preliminary injunctive relief. The first claim is a claim for breach of contract through failure to deliver software developed for NCS licensees. The second claim is for misappropriation of trade secrets. The third claim is for breach of contract through breach of non-competition obligations.

8. Plaintiff's motion requires construction of the contractual term "State Requirements Code" or "SRC." Plaintiff asserts that the Agreement defines that term in section 1(m) of the Agreement, which broadly states that "any state-mandated report is considered a state reporting requirement, and any code developed to meet any such state reporting requirement is considered SRC for purposes of this Agreement."

9. Defendant asserts that the definition plaintiff proffers conflicts with the definition in a schedule entitled "State Requirements Code Development and Royalty Schedule" (the "Schedule") which provides in its first paragraph that "[a]ny State Requirements Code products, ("SRC") and SRC Enhancements (as defined in Section 3 below) developed by CSSA (a) will meet the specific state reporting requirements for the Territory as defined by the provincial or

3

state department of education, and/or as mutually agreed upon by NCS and CSSA . . . ." According to defendant, this language limits the definition of SRC to include only those items mandated by state departments of education.

10. There is no dispute that defendant has retained certain code that it would be required to deliver to plaintiff if the plaintiff's definition of SRC is correct.

11. Having reviewed the contract and the parties' respective positions, the Court perceives no conflict between the language in the Schedule and the extremely broad language defining State Requirements Code. The Schedule pertains to the development and maintenance of State Requirements Code, not the ownership of the code once developed.

12. That conclusion is confirmed by the further provision under the Agreement that all such code remains the property of NCS; it does not become the property of CIC. Subsection 9(e) of the Agreement, on page 25, states that "NCS shall retain all right, title and interest in and to all SRC code, SRC Enhancement code, and Custom Code developed by CSSA pursuant to this Agreement." The Court therefore concludes that there is no conflict between the Schedule and the basic definition of State Requirements Code in the Agreement itself.

13. If a report is federally mandated, the Court concludes that the material does not fall within the definition of a State Requirements Code and need not be delivered to the plaintiff. Where, however, state law mandates the creation of the report, and/or any state agency other

than the education agency mandates preparation of the report, the Agreement requires that the report and material must be delivered to the plaintiff.

14.   Based on this Court's conclusion regarding the definition of SRC, the Court concludes that NCS has demonstrated a substantial likelihood of success with respect to its contract claim based upon its right to State Requirement Code.

15.   Plaintiff's motion also requires construction of the contractual term "Custom Code." Section 7(c) at page 23 of the Agreement provides that "NCS acknowledges that any programs or products that are created by the CSSA without the use of source code from NCS Products, and that are not created pursuant to NCS' request and are not derivative works (as defined in the Copyright Act) of NCS Licensed Materials, do not fall within the definition of Custom Code."

16.   According to the Copyright Act, a "derivative work" is a "work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adopted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'"

17.   There seems to be a conflict between the definition of "Custom Code" in the definitions section of the Agreement and the later definition of "CSSA products other than

Custom Code," which evidently belongs to CIC under the parties' arrangements. In the event of an ambiguity or similar tension between those two provisions, the Court applies the principle that the Agreement is to be construed against the person or the entity that drafted the Agreement. The Court therefore applies the definition of "CSSA Products other than Custom Code" set out in the State Requirements Code, Development and Royalty Schedule.

18.  The defendant states that no code that it has withheld is "Custom Code" as defined by that Schedule, and the Court accordingly concludes, with respect to Custom Code, that at this stage of the litigation, the plaintiff has not met its burden of proving that there is a substantial likelihood on the merits of its claim that the defendant will be required to return any of what defendant identifies as CSSA Products other than Custom Code.

19.  With respect to its trade secret claim, the plaintiff contends that the defendant is still servicing products based on plaintiff's trade secret software using SRC and Custom Code that plaintiff owns, along with the NCS Licensed Material on which the SRC and Custom Code is based. Defendant has represented that it has returned or destroyed, and is no longer using, what it believes to be all NCS Licensed Materials.

20.  As to the trade secret claims relating to SRC and Custom Code, the claims stand or fall according to the contractual interpretations that the Court has already determined. The SRC is a trade secret that should have been and now should be delivered to the plaintiff. As to what defendant identifies as CSSA Products other than Custom Code, the plaintiff has not at this

6

point satisfied its burden of proving that any of it is a trade secret that belongs to the plaintiff, for the reason already stated.

21.     The Court thus finds in part that the plaintiff is likely to succeed on the merits of its trade secret claim, and in part that it has not yet shown that it is likely to succeed on the merits of the claim.

22.     Plaintiff's third claim for relief is based upon the non-competition provision in the Agreement. That provision, § 15(c) at page 10 of the Agreement, states that "CSSA . . . shall not . . . directly or indirectly engage in or have a financial interest in the production, reproduction, sales, licensing, distribution or servicing of any products competitive with the NCS Products listed in the Support and Professional Services Schedules [and that it] shall not . . . develop or market any software that would compete with NCS Products without NCS' prior written consent." The Second Amendment to the Agreement limits the restraint to "NCS customers to whom CSSA is delivering Support or Services."

23.     Because it appears that the defendant was communicating not only with customers to whom it had not been providing support services but also to customers to whom it had been providing support services, it cannot rely on the amendment to the Agreement to make its actions proper.

24.     Nonetheless, the Court concludes that the evidence indicates that the defendant did nothing to breach the non-competition clause. There is nothing in the non-competition clause

that survives the expiration of the Agreement.  As of June 30, the defendant was free to use and market and sell and service competitive products.  The Court credits the testimony by Mr. Bohlender that the defendant did not market or talk about or develop software that would compete with the plaintiff's software.  The Court sees nothing improper in CIC telling customers that after June 30 it would be selling competitive products.  In the Court's view, that falls on the line of simply informing customers and not marketing or otherwise violating the terms of the Agreement.  For that reason, at this juncture, the Court is unable to conclude that there is a likelihood of success on the merits of the breach of contract claim based upon breach of the non-competition obligations.

25.     With respect to the second element necessary to obtain preliminary injunctive relief – whether the plaintiff has shown irreparable injury by virtue of defendant's failure to deliver SRC material – the Court is persuaded by Ms. Albanese's testimony that there will be inevitable loss of customer good will that cannot be compensated by money damages.  Such harm will occur because if NCS does not obtain injunctive relief, it will not be able fully to serve its customers.  As the Court understands it, the customers are receiving enhancements to the base program that they are not able to install and that NCS is unable to assist them in installing because NCS does not have from the defendant the code and the materials it needs to be certain that it can provide this assistance to the customers.  The loss of good will is the primary form of

irreparable harm that the plaintiff has shown with respect to its contract claim based upon defendant's failure to deliver the SRC software.

26. With respect to the issue of irreparable harm based upon the misappropriation of a trade secret, the Court notes that, according to Minnesota law, an inherent threat of irreparable injury sufficient to invoke at least temporary equitable relief may be inferred from the breach of an otherwise valid and enforceable restrictive covenant not to disclose trade secrets sufficient to invoke at least temporary equitable relief.  For that reason, the Court concludes that the plaintiff also has sufficiently shown irreparable harm with respect to its claim based upon misappropriation of trade secrets.

27. With respect to the third element of the test for a preliminary injunction – balance of harms – it appears to the Court that the ongoing injury to the plaintiff's reputation and good will outweigh any injury the defendant might suffer by being enjoined from what is under the Agreement an improper use or misuse of the plaintiff's trade secrets and what under the Agreement is a breach of the Agreement by failure to deliver the SRC code.  The Court does not see that the defendant will suffer any legally cognizable harm if it is forced to return the SRC code and comply with the contract.

28. With respect to the fourth element of the test for a preliminary injunction – the public interest – the Court notes that most of the customers affected by this injunction are likely to be schools and school districts.  It is in the public interest that an injunction issue in this case

to minimize the potential disruption of the business and operations of these various school districts, particularly when it is approximately one month from the beginning of school.

29. As to a bond, the defendant has presented no evidence as to any harm it might suffer as a result of a preliminary injunction being issued, and the Court accordingly does not require the posting of a bond.

### **RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Based on the findings of fact and conclusions of law set forth above, the Court rules as follows:

1. Plaintiff's Motion for Preliminary Injunction with respect to plaintiff's request that defendant deliver all State Requirements Code and Custom Code to plaintiff is GRANTED with respect to State Requirements Code but DENIED with respect to other undelivered code, which defendant characterizes as CSSA Products Other than Custom Code.

2. Plaintiff's Motion for Preliminary Injunction with respect to plaintiff's request that all NCS Licensed Materials, State Requirements Code, and Custom Code, not be retained, disclosed, or used by defendant on the ground that it constitutes plaintiff's trade secrets is MOOT with respect to NCS Licensed Materials, GRANTED with respect to State Requirements Code, and DENIED with respect to other undelivered code, which defendant characterizes as CSSA Products Other than Custom Code.

3.      Plaintiff's Motion for Preliminary Injunction with respect to extending the noncompetition period as a result of defendant's alleged marketing of competing products to joint customers of plaintiff and defendant is DENIED.

## ORDER FOR PRELIMINARY INJUNCTION

1.      CIC, and its officers, agents, servants, employees, and attorneys, and all others in active concert or participation with them who receive notice of this Order, shall turn over forthwith to NCS all State Requirements Code, such Code to include all computer programs developed by CIC for use in generating any state-mandated report, and the source code, object code, and user and technical documentation relating to such computer programs, along with all related computer programs and documentation necessary to integrate, evaluate, or test such Code, such additional materials to include all Application Control System code and technical documentation relating to such State Requirements Code, to the extent defendant possesses such materials.

2.      CIC, and its officers, agents, servants, employees, and attorneys, and all others in active concert or participation with them who receive notice of this Order, shall not further use or license any such State Requirements Code; and after delivery to the plaintiff as ordered in the preceding paragraph shall destroy all additional remaining copies of the software and other items delivered to NCS.

3.      This Preliminary Injunction shall remain in place until further Order of the Court.

IT IS SO ORDERED.

Dated: August 9, 2005                                    <u>s/Edward W. Nottingham            </u>
                                                         Edward W. Nottingham
                                                         United States District Judge